**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**


United States of America,                              Case No.: 3:14CR403

        Plaintiff,

        v.                                                    **ORDER**

Susan M. Pioch, et al.,

        Defendants


This is a criminal case in which a jury, following a two-week trial, convicted the three

defendants – Susan M. Pioch, Kurt Mallory, and Margaret McKnight[1] – of conspiracy to commit mail

and bank fraud and related substantive offenses: Pioch of bank fraud, mail fraud, aggravated identity

theft, money laundering, and filing a false tax return; Mallory of bank fraud, mail fraud, aggravated

identity theft, and money laundering; and McKnight of bank fraud, mail fraud, aggravated identity

theft, and money laundering.

Pending are each defendant's Fed. R. Crim. P. 33 motion for a new trial. (Docs. 336, 337,

339). For the reasons that follow, I overrule the motions.

**Background**

Mallory and McKnight lived on the second floor of a duplex that Martin Fewlas owned.

Fewlas, a widower and retired Toledo city worker, lived on the first floor. Despite his humble

---

[1] A fourth defendant, Gary Mallory, father of defendant Kurt Mallory, pled guilty and testified, *via* a video deposition, as a government witness. More about him later on.

employment, Fewlas had amassed an estate of about $2.2 million. He had had no contact with his family for several years, and his daily routine was, starting around noon, to go to a series of bars.

Fewlas died on August 28, 2010. A few days later, most likely in the late morning of Wednesday, September 1, 2010, Pioch – an attorney who had drafted and made several copies of a will leaving Fewlas's entire estate to McKnight – had Gary Mallory forge Fewlas's signature. Pioch and Kurt Mallory witnessed the signing of the fake will, which was dated June 16, 2010.

Unbeknownst to the conspirators, Fewlas had executed a *bona fide* will in 1993. At the time of Fewlas's death, a grand-nephew, James McLaughlin, was the heir under that will. Pioch had, however, notified McLaughlin, who was unaware of the genuine will, that Fewlas had executed a will – *i.e.*, the fake will.

Pioch filed the fake will with the Lucas County, Ohio, Probate Court. That court handled the will and estate in a routine manner, and, in time, McKnight acquired control over Fewlas's estate.

At that point the three defendants no doubt believed they had concocted and flawlessly carried out a scheme as facile as it was foolproof. On its face, there was nothing unusual about the will, its presentation by Pioch, or the probate process. In colloquial terms, it simply slid on by.

The conspirators were, however, a little too smart and a whole lot too stupid for their own good. McKnight began withdrawing funds from the fourteen bank accounts in which Fewlas had had substantial savings. McKnight, presumably counseled by Pioch, on several occasions withdrew $9,999 from individual accounts. But sometimes on the same day that McKnight had done so, she also took additional funds from other accounts in other branches of the same bank.

Her activities came to the attention of the Internal Revenue Service. Its agents began to investigate the situation. When confronted, McKnight, spilling blood before the sharks, denied her

activities. One thing led to another, and then, finally, to the indictment, trial, and convictions. What had appeared at the outset foolproof was, in the end, foolish and foolhardy.

Long before that endpoint, the IRS had, on April 11, 2013, executed search warrants at the duplex and Pioch's office and home, and had documents, other evidence, and what remained of the estate's assets – about $750,000.

Before then, Pioch had received $200,000 from McKnight, plus a commitment to receive $500,000 in anticipation of a will contest.[2] Mallory had bought a recreational vehicle and a used-car lot. He and McKnight had expended considerable sums on other playthings and gambling junkets to Las Vegas.

By the time of sentencing, about $600,000 remained unaccounted for.

The defendants' motions raise, in sum, seven challenges to their convictions: 1) insufficiency of the evidence to sustain the guilty verdicts; 2) a Confrontation Clause challenge to admission of Gary Mallory's testimony by way of video deposition; 3) improper admission of Defense Exhibit 505; 4) improper admission of hearsay; 5) improper prosecutorial vouching; 6) improper encouragement to the jury to disregard expert testimony; and 7) improper prosecutorial allusion during rebuttal to an exhibit not admitted into evidence.

None of these contentions has any merit.

---

[2] The will, as noted, passed effortlessly and without incident through probate. Pioch's deflection of McLaughlin had succeeded completely – and had gained her the expectancy of a half-million dollar "fee."

**Discussion**

**1. Convictions Not Contrary to the
Manifest Weight of the Evidence**

In evidence-parsing arguments more suitable to closing to a jury than in new trial motions,
the defendants claim that the evidence cannot support the verdict.

The jury had but one issue to decide: was the will dated June 16, 2010, real or fake. To make
this determination, the jury had to determine the reliability or lack thereof of the testimony of Gary
Mallory, the government's or the defendants' handwriting experts, and Pioch and/or Kurt Mallory,
both of whom testified.

The jury only had either to believe Gary Mallory or the government's handwriting expert or
disbelieve Pioch/Kurt Mallory to find the will was a fake and return guilty verdicts.

Indeed, the jury had to resolve only one of these three alternatives against the defendants to
return sustainable jury verdicts. Once it had resolved one against the defendants, it had no need to
consider or resolve the other two. To return not guilty verdicts, the jury, in contrast, had to find in
the defendants' favor as to all three of these determinative questions.

**A. Gary Mallory**

Gary Mallory testified that he had forged Fewlas's signature on the June, 2010, will. Gary
Mallory was an admitted liar who had a history of fraudulent activity. His own daughter confirmed
that he had frequently lied in the past. For many years he had been long estranged from his son Kurt.
At the time of the crime, though, Gary Mallory was living with Kurt and McKnight.

After probate of the forged will, he accepted nothing from the estate and returned to Arizona,
where he earlier had lived before his sojourn in Toledo. He then returned to seek money from Kurt,

who turned him down. Gary Mallory then approached Pioch, went to her office, demanded $50,000, and threatened to disclose the crime if not paid. Like Kurt, Pioch angrily rejected his blackmail attempt. A colleague, a former police officer, told her to file a police report about the incident, and she did so.

On the other hand, when IRS agents first approached him, Gary Mallory had immediately "fessed up" to his role in the forgery – thereby admitting that he had committed a felony.

Even before then, Gary, who acknowledged his attempt to blackmail Pioch, had made good on his threat to her to tell the authorities about the forgery. He had thereafter called the Probate Court and reported that the will was a fake. The person with whom he had spoken had, however, literally hung up on him. In making that call, however, Gary Mallory had exposed himself to possible prosecution; he could not have anticipated that no one would pay attention to him.

The jury could have gone either way with regard to Gary Mallory's credibility. If the jury believed him, it had to return a guilty verdict.

### B. Expert Handwriting Testimony

Even if the jury did not believe Gary Mallory, it could return a guilty verdict if it gave greater weight to the testimony of the government's handwriting expert than to the defendants' expert. Both experts exhibited samples of Fewlas's known signature for comparison with the signature on the will.

The jury could have gone either way as to the expert handwriting-analysis testimony. There is no need to try, as the parties do, to parse the conflicts between the experts. They are in the record.

It was up to the jury to credit one expert's assessment over the other; that's what jurors always have to do when the parties offer conflicting, but equally plausible, expert testimony.

If the jurors gave greater weight to the government's expert they had to return guilty verdicts.

### C. Pioch's Testimony[3]

I turn last to what the jurors might have considered first: namely, whether Pioch's testimony about the will was truthful or false.

Pioch testified that Kurt Mallory, who had done some painting work at an apartment in which she had an interest, had introduced her to Fewlas. There was third-party testimony that she had met, as she testified, with Fewlas at a bar. She had with her a legal pad for taking notes. According to her, she prepared the will and he signed it in June, several weeks before his death.

The parties offered conflicting testimony about Fewlas's possible testamentary intent. Supportive of Pioch's testimony (and the validity of the will) was undisputed evidence that Fewlas had known McKnight most of her life. She resembled his late wife, which made him especially fond of her. Some witnesses testified that Fewlas had indicated that he wanted to "take care of" McKnight. Kurt Mallory testified that McKnight had cared for Fewlas, and that Fewlas and she had had a close, friendly relationship.

Other evidence, both third-party and circumstantial, supported the government's contention that, due to McKnight's involvement with Kurt Mallory, Fewlas would never have intended to leave his estate to her, thereby risking that it would come under Mallory's control. According to some witnesses, Fewlas both loathed and feared Mallory.

---

[3] While the jurors also could have returned guilty verdicts if they disbelieved Kurt Mallory's testimony, I focus on Pioch's testimony. The jury's decision one way or the other was, on its own, outcome-determinative. A finding that she was lying would have mooted the need to consider anything else.

There was rather stark circumstantial evidence that undercut the view of McKnight as Fewlas's loving caregiver: namely, that, following Fewlas's death and cremation, she (or Mallory) put his remains in a cardboard box, which they left behind after they moved out of the duplex. At some point the house was plundered (the door having been left open after the IRS broke in to execute its search warrant), and the box became water-logged.

Whatever view the jury might have taken toward the conflicting evidence about Fewlas's possible testamentary intent, and whether it might have viewed McKnight's attitude toward Fewlas as heartfelt or heartless, did not, in the end, really matter.

What mattered was the jury's view of Pioch's truthfulness. As with Gary Mallory's credibility and the weight of the expert testimony, there was no real need for the jurors to try to sort though the sparse and spotty evidence about what Fewlas might have intended, and why he might have intended it.

This was so because the government had documents that Pioch herself had prepared and endorsed that directly undercut her credibility.

The first of these were three inherently inconsistent federal tax returns that Pioch had filed.

Her initial return for 2010 did not include the $200,000 she had received from McKnight as her share of the Fewlas estate.

After the IRS had executed its search warrants on April 11, 2013, Pioch filed an amended return one week later. In that return she declared the $200,000 as ordinary income, explaining that she had "inadvertently missed some gross receipts in the business income." (Tr. 156).

Then, on learning that, by declaring her "fee" as ordinary income she had incurred a $40,000 tax liability, Pioch filed a second amended return declaring that income as a capital gain. To justify

7

that explanation, she claimed to have given McKnight a half interest in her apartment building. There had been no formal transfer of any such interest, which Pioch claimed she had undertaken to keep McKnight from continuing to waste the assets she had obtained from the Fewlas estate.

Standing alone, the inconsistencies in Pioch's tax returns and the implausibility of her efforts to explain those returns and her reasons for filing them could have sufficed for the jury to discredit her testimony about the *bona fides* of the bogus will.

But there was more, and even more damning, impeachment evidence: namely, Exhibit 505 on her Exhibit List, which, *per* pretrial order, she had provided to the government shortly before trial.

The exhibit list that Pioch's attorney provided to the government before trial included defense Exhibit 505.[4] That exhibit purported to be an unexecuted Power of Attorney from Fewlas to McKnight, giving her authority over all his real property. It bore the endorsement, "Prepared By: Susan Pioch, Esq.," and was dated June, 2010 – just like the fake will.

The document references 2521 Airline Road, Toledo. But Fewlas never owned that property; indeed, it did not go on the market until several months after his death. The sellers had never heard of Fewlas. Kurt Mallory bought the Airline Road property with funds he obtained from McKnight.

The IRS agents executing the search warrants at Pioch's home and office did not find this document. The government did not know about it until it arrived with Pioch's other proposed trial exhibits.

---

[4] I discuss the defendants' challenge to the admissibility of this exhibit *infra*.

Pioch did not – and, in any event, clearly could not – offer a plausible explanation for this document, which she claimed to have prepared at about the same time as the fake will. But that, of course, was not just implausible – it was impossible.[5]

## D. Conclusion re. Sufficiency of the Evidence

Viewed most favorably in support of the guilty verdict, the evidence, despite all the conflicts, was clearly sufficient to support the those verdicts. The jury might or might not have believed Gary Mallory; it might or might not have given more weight and credence to the defendants' handwriting expert; and it might even, though it would seem hardly likely, have believed Pioch.

From the verdicts, though, it is readily apparent that, as to at least one of these dispositive issues, the jury found in favor of the government and against the defendants. The time it took to return a verdict – about three hours – was, despite the defendants' protestations, more than ample for it to evaluate all the evidence that bore directly on Gary Mallory's credibility, which handwriting expert to accept, and whether Pioch's testimony was at all believable.

There was plenty of time for it to decide the outcome fairly, and there was plenty of evidence to support its decision to find all defendants guilty on all counts.

## 2. Confrontation Clause

The defendants renew their objection to my pretrial determination that, due to his deteriorated health, Gary Mallory was unavailable to testify in person in Toledo.

I have reviewed the defendants' contentions, the government's response, and my pretrial order overruling the defendants' Confrontation Clause objection to Gary Mallory's video testimony.

---

[5] The government provided the most sensible explanation for this document: Pioch prepared it and gave it to her attorney before trial to offer as proof that she was doing legal work for Fewlas in June, 2010.

*U.S. v. Pioch*, --- F. Supp. 3d ----, 2016 WL 8715918 (N.D. Ohio). On the basis of that review, I perceive no reason to revise, much less reverse, my original ruling allowing the jury to hear Gary Mallory's testimony by video rather than in person.

### 3. Evidentiary Issues

### A. Defense Exhibit 505

The defendants claim that Exhibit 505, the bogus Power of Attorney, lacked an adequate foundation on which to find that it was what the proponent – the government – claimed it to be: namely, a bogus document that Pioch prepared *post hoc* to bolster her claim that in June, 2010, she was doing other legal work for Fewlas besides preparing the will that she presented for probate.

McKnight complains this documents comes "from thin air."

I disagree: I have no doubt that it came from Pioch and that it is exactly what the government says it is. Every known circumstances supports my confidence in that regard.

First: it bears the endorsement, "Prepared By: Susan Pioch, Esq." She acknowledged, evasively, that her assistant "could have" prepared it. Without more, the endorsement and acknowledgment, half-hearted as it was, suffice to make it more likely than not, as Fed. R. Evid. 901 requires, that the document came from Pioch and no place else. Moreover, its only possible usefulness as a defense exhibit was to support her testimony about doing legitimate legal work for Fewlas in June, 2010.

In addition, on July 13, 2011, Kurt Mallory had signed an affidavit (though, to use the currently popular euphemism for recantation, he "walked it back" during the trial) stating that "[McKnight] had [Fewlas's] POA."[6]

Had this document been in existence, moreover, before the IRS agents executed their search warrants, they no doubt would have found and seized it.

Another indication of *post hoc*, pretrial fabrication is the absence of a signature. If Pioch had prepared the Power of Attorney concurrently with the will, it would have been signed concurrently with the will – whenever and by whomever the will was signed.[7]

Finally, Pioch was the only person who could have provided the exhibit to her attorney, who in turn, no doubt at her request, listed it as an exhibit and gave it to the government.

In sum: there was no other possible, let alone likely, author or source than Pioch. And certainly there was and is no reason not to conclude that Exhibit 505 is anything other than what the government claimed it to be: a bogus document that Pioch prepared in anticipation that it would corroborate her false testimony about the forged will.

To be sure, once in the government's hand and put before the jury, Exhibit 505 was highly prejudicial. But it was not, under Rule 403, unfairly so, given its significant probative effect as impeachment evidence.

---

[6] McKnight, of course, did not and could not have had Fewlas's Power of Attorney, as the purported "POA" was unsigned when Pioch gave it to her attorney before trial.

[7] The most likely reason that the signature line on the Power of Attorney was blank is that, when Pioch prepared it, Gary Mallory was neither available nor wiling to attempt a further forgery.

**B. Hearsay**

McKnight argues that I should not have admitted testimony by Fewlas's friends about his antagonism toward Kurt Mallory.[8]

The government raised the issue of admissibility of this testimony in a pretrial motion in limine. (Doc 180). I granted the government's motion, finding that "Fewlas's antagonism toward Mallory is relevant to the issue of whether he would have left his substantial estate to Mallory, or, as the indictment alleges, the defendants, including Mallory, engaged in a conspiracy, via a forged will, to obtain the estate's assets." (Doc. 219).[9]

I agree with the government that I committed no error in admitting Fewlas's statements.

Rule 803(3) of the Federal Rules of Evidence allows statements "of the declarant's then-existing state of mind (such as . . ., intent, or plan)."

As I did in this case, other courts have applied Rule 803(3) to admit a deceased person's views toward the defendants. *E.g., U.S. v. Johnson*, 442 F. App'x 85, 95 (6th Cir. 2011) (evidence offered "to indicate a breakdown in the relationship").

I find no error in admitting this evidence. In any event, if I erred, this evidence – and that like it that the defendants offered to prove that Fewlas really favored McKnight over anyone else – could not have tipped the balance one way or the other. Its bearing on whether the will was fake or real

---

[8] The government points out that it raised this issue in pretrial motion in limine, which no defendant opposed. The lack of opposition presumably reflected the defendants' intent to offer statements by others about Fewlas's affection for McKnight and intent to "take care" of her.

[9] Only Pioch responded to the government's motion in limine. She expressed no objection, provided that I allowed the defense, as I did, to offer counter-evidence of the same sort. As noted above, the evidence as to Fewlas's testamentary intent was, in the end, sparse, spotty, and speculative.

was, at most ancillary: what mattered was how the jury viewed the testimony by Mallory, the handwriting experts, and Pioch.

## 4. Prosecutorial Misconduct

### A. Vouching

Mallory claims the government improperly vouched for Gary Mallory's credibility when the prosecutor stated in closing argument that the jurors should rely on common sense in making credibility determinations.

There is no merit to this contention for two reasons.

First, vouching occurs when the prosecutor expresses his or her personal view as to a witness's truthfulness. *E.g., Wilson v. Bell*, 368 F. App'x 627, 633 (6th Cir. 2010). That simply did not happen here.

Second, my instructions expressly told the jurors that, among other things, they could use their common sense in determining whom to believe.

It was likewise not vouching for the prosecutor to ask rhetorically:

> [I]f you're going to make up a story to blackmail someone, why are you going to make up a story that puts you at the center of the forgery, puts the pen in your hand? Why not make up a story that says, hey I wasn't involved in it, but you confessed to me, or I saw you do it, or I have some other evidence that puts you in the conspiracy? Then if you don't get any money, well, no harm done. Right? What did Gary Mallory get out of this? He got no money and a felony conviction. What a crazy thing to do if that story's not true. If you want to make up a story, you can do an awful lot – much better job than what Gary Mallory did.

 (Tr. 1839).

In making these comments, the prosecutor did no more than point out how Mallory's claim, which he made not just at, but well before, trial, about his acts as a forger was against both his penal and pecuniary interests. This is not improper. *Wilson, supra*, 368 F. App'x at 633. Nothing in these

13

comments expressed the prosecutor's personal view as to Mallory's credibility: no vouching occurred.

In any event, the statements were not sufficiently flagrant to justify a new trial. They did not "tend[ ] to mislead the jury or prejudice the defendant," they were isolated, not extensive, they were more accidental than deliberate, and the evidence against the defendants was strong. *Wilson, supra*, 368 F. App'x at 634-35.

### B. Comments re. Handwriting Expert Testimony

In its closing argument, the government encouraged the jurors to reach their own conclusions about the genuineness of the signature on the will. This was in accord with my conventional instruction that the jurors did "not have to accept [the opinion] testimony or find it conclusive as to the particular matter."

This was especially apt here. Other courts have held that jurors can properly conduct their own visual comparison of known and contested exemplars. *See U.S. v. Jones*, 107 F.3d 1147, 1160–61 (6th Cir. 1997) ("[T]he ability of jurors to perform the crucial visual comparisons relied upon by handwriting experts cuts against the danger of undue prejudice from the mystique attached to 'experts.'"); *see also U.S. v. Buck*, 1987 WL 19300,*3–4 (S.D.N.Y.) (jurors "can perform visual comparisons of handwriting samples as easily as experts can").

It was, accordingly, proper and permissible for the government to encourage the jurors to look with their own eyes and, in light of what the experts had to say, make up their own minds about what they saw.

## C. Comment on Defense Exhibit 515

Gary Mallory testified unequivocally about the time within which the forgery occurred – which worked out to be the late morning on either Monday, August 30, Tuesday, August 31, or Wednesday, September 1, 2010. Pioch was able to establish that she could not be at Fewlas's residence, where the forgery occurred, on either Monday or Tuesday morning.

With regard to her activities on Wednesday, September 1st, Pioch testified that she had gone to the Juvenile Court for a 9:30 a.m. pretrial conference, and that she had a hearing in Domestic Relations Court that afternoon starting at 1:30 p.m.

On arriving at the Juvenile Court she learned that the court had vacated the conference.

Exhibit 515, which was not offered or admitted into evidence, was a copy of that court's order, entered a couple of days later, vacating its September 1st conference. It corroborated Pioch's testimony about the conference being vacated, and her additional testimony that she had not had prior notice of that fact before going to the courthouse that morning.

Pioch further testified that she had then spent an hour talking with the Magistrate.

Pioch did not account for the time between the end of her conversation with the Magistrate and her 1:30 domestic relations hearing.[10] That being so, the jury could have found, in weighing her "I couldn't have been there then" quasi-alibi defense, that she in fact had had ample time to go to Fewlas's residence, preside over the signing of the fake will, and return in time for her 1:30 hearing.

---

[10] The government's opposition notes that the distance from the Juvenile Court to Fewlas's residence is three miles. I take judicial notice that that is accurate. I also note judicially that the Lucas County Juvenile Court and the Lucas County Domestic Relations Court are in the same building in downtown Toledo. So Pioch's point of departure and her return destination were the same.

In closing argument, Pioch's attorney mistakenly asserted that the Domestic Relations hearing had been in the morning, not in the afternoon, as Pioch had testified:

> Let's look at the morning of the 1st. We have her date book. 9:30, Lange pretrial in Domestic Relation. She's downtown, tied up in Domestic Relations Court, which takes a long time. She has an afternoon appointment, and, no, she didn't run out to 2557 Broadway and had a forgery party between those events. It's a lie. We've proven it to be a lie, and we don't have to prove anything. But I think we have.

(Tr. 1924).[11]

In rebuttal to this misstatement, the prosecutor alluded to Exhibit 515. At the time, he did not realize that the defense had not offered the exhibit into evidence.[12] When, at sidebar, I learned that that was so, I instructed the jury to disregard the prosecutor's reference to that unadmitted exhibit.

Nothing about the government's passing reference to Exhibit 515 justifies a new trial.

Instead of tending to mislead the jury, the government sought in good faith to eliminate any confusion that Pioch's attorney's misstatement about Pioch's timetable may have generated.[13] Thus, there was no misconduct. *See U.S. v. Millar*, 79 F.3d 338, 343 (2d Cir. 1996) (mistaken reference to exhibit not in evidence was not misconduct); *U.S. v. Vida-Noriega*, 281 F. App'x 718, 719 (9th Cir. 2008) (reference to unadmitted exhibit was "an honest mistake" rectified by a curative instruction).

---

[11] I have no doubt that Pioch's attorney misstated her timetable inadvertently and unintentionally.

[12] I am convinced that this mistake in that respect was every bit as inadvertent and unintentional as the misstatement by Pioch's counsel.

[13] There is no dispute that, in fact, Pioch was due in Juvenile Court at 9:30 and Domestic Relations Court at 1:30.

Finally, as already noted, the government's case was very strong. Even if there had been misconduct, and even if it had been flagrant, it could have had no more than a featherweight effect on a balance that already tilted overwhelmingly against Pioch.

## Conclusion

There is no merit to the motions for new trial.

It is, accordingly,

ORDERED THAT the motions of the defendants for a new trial (Docs. 336, 337, 339) be, and the same hereby are, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge